STATE of Utah, Plaintiff and Appellee,

v.

Ronnie Lee GARDNER, Defendant
and Appellant.

STATE of Utah, Plaintiff and Appellee,

v.

Gary SIMMONS, Defendant
and Appellant.

v.

Nos. 950330, 950344.

Supreme Court of Utah.

Sept. 30, 1997.

Jan Graham, Atty. Gen., Carol Clawson, Solicitor Gen., Christine Soltis, Marian Decker, Asst. Attys. Gen., Salt Lake City, for the State.

Ronald J. Yengich, Hakeem Ishola, Salt Lake City, for Gardner.

Stephen R. McCaughey, G. Fred Metos, Salt Lake City, for Simmons.

Jensie L. Anderson, Salt Lake City, for amicus American Civil Liberties Union.

DURHAM, Justice:

This is a challenge to the constitutionality of section 76–5–103.5(2)(b) of the Utah Code, which permits the death penalty for aggravated assault by a prisoner. Two defendants charged with capital offenses under the statute have appealed from trial court rulings that the statute is constitutional, and we have consolidated their cases for review.

For purposes of clarity, it should be noted that only a portion of this opinion (part III. B.2) reflects the holding of a majority of the court (Justices Durham, Stewart, and Zimmerman). The remainder of the opinion represents my views and those of Justice Stewart. Justices Russon and Howe dissent from the entire opinion and the result.

## I. BACKGROUND

Defendant Ronnie Lee Gardner was convicted of a capital felony, for which he was sentenced to die, and two first degree felonies, for which he was serving sentences of five years to life at the state prison when he allegedly stabbed a fellow inmate multiple times in the face, neck, abdomen, and chest, causing serious bodily injury. Defendant Gary Simmons was serving a sentence of ten years to life for a first degree felony at the Central Utah Correctional Facility in Gunnison, Utah, when he allegedly attacked a prison guard with his fists, causing the guard serious bodily injury.[1] Gardner and Simmons were both charged with capital felonies under section 76–5–103.5(2)(b) of the Utah Code. That section provides:

(2) Any prisoner serving a sentence for a felony of the first degree who commits aggravated assault is guilty of:

. . . ;

---

1. Simmons died in prison while this appeal was pending.

(b) a capital felony if serious bodily injury was intentionally caused.

Utah Code Ann. § 76–5–103.5(2)(b) (1995).

The two prisoners each filed preliminary motions seeking to have the capital felony provision of the statute declared unconstitutional. The prisoners argued that the death penalty for aggravated assault by a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. They also argued that the penalty violates the cruel and unusual punishments clause and the unnecessary rigor clause of article I, section 9 of the Utah Constitution.

## II. ARTICLE I, SECTION 9, UTAH CONSTITUTION

I begin by addressing defendants' challenge to section 76–5–103.5(2)(b) under the Utah Constitution. Section 9 of Utah's Declaration of Rights provides:

> Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor.

Utah Const. art. I, § 9. Defendants argue that we should strike down section 76–5–103.5(2)(b) under the unnecessary rigor clause of section 9, which, as we noted in *State v. Bishop,* 717 P.2d 261, 267 (Utah 1986), has no counterpart in the federal constitution. I do not reach the unnecessary rigor clause analysis, however, because I would hold that the cruel and unusual punishments clause of section 9 is dispositive.[2]

"Because the issue of constitutionality presents a question of law, 'we review the trial court's ruling for correctness and accord it no particular deference.'" *Ryan v. Gold Cross Serv., Inc.,* 903 P.2d 423, 424 (Utah

1995) (quoting *Mountain Fuel Supply Co. v. Salt Lake City Corp.,* 752 P.2d 884, 887 (Utah 1988)). I also note that these cases come before us on interlocutory appeal from the denial of preliminary motions—neither of the prisoners has yet been tried or sentenced under the statute in question. Therefore, I will not consider whether the statute is constitutional as applied to the specific facts of these cases, but only whether the statute is constitutional on its face.

We have set forth "the burden to be met by one who challenges an enactment [as a violation of the Utah Constitution]: The act is presumed valid, and we resolve any reasonable doubts in favor of constitutionality." *Society of Separationists, Inc. v. Whitehead,* 870 P.2d 916, 920 (Utah 1993); *see also State v. Mohi,* 901 P.2d 991, 995 (Utah 1995) ("While ruling on the constitutionality of a statute, we will resolve doubts in favor of constitutionality.").

### A. Utah's Cruel and Unusual Punishments Clause: Defining the Principle of Proportionality

Although we have on various occasions treated the identical clause in the Eighth Amendment to the federal constitution, *see, e.g., Monson v. Carver,* 928 P.2d 1017, 1023 (Utah 1996); *State v. Mace,* 921 P.2d 1372, 1376–79 (Utah 1996); *State v. Andrews,* 843 P.2d 1027, 1030–31 (Utah 1992); *Zissi v. State Tax Comm'n,* 842 P.2d 848, 858–60 (Utah 1992), this court has never fully articulated the meaning of "cruel and unusual punishments" as it appears in article I, section 9 of our own constitution. *Bishop,* 717 P.2d at 267. We have held that the cruel and unusual punishments clause mandates certain procedural safeguards against discrimination, arbitrariness, caprice, and irrationality in administering capital punishment, *State v. Pierre,* 572 P.2d 1338, 1356 (Utah 1977); *see also State v. Young,* 853 P.2d 327, 402 (Utah

---

**2.** The State did not address the state constitutional issues in its brief and at argument other than to argue that defendants' reliance on the state constitution is merely nominal and insufficiently supported by independent analysis. *See State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988) (declining to reach state constitutional claims on grounds that defendant "relied nominally on state constitutional provisions while actually relying on the parallel federal constitutional provisions and analysis based on them"). In light of the paucity of guidance offered by decisions of this court or the court of appeals on the meaning of article I, section 9 of the Utah Constitution, I regard defendants' efforts sufficient in this capital case to properly present the state constitutional question for our analysis.

1993) (Durham, J., dissenting), but we have not set forth the substantive standards for determining what kinds of punishment are per se cruel and unusual. We may, of course, independently articulate the standards established by Utah's cruel and unusual punishments clause, and these cases present an appropriate occasion to do so.

We have held that the standard for cruel and unusual punishment claims in specific applications is " ' "whether the sentence imposed in proportion to the offense committed is such as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances." ' " *Monson*, 928 P.2d at 1024 (quoting *State v. Russell*, 791 P.2d 188, 190 (Utah 1990) (quoting *State v. Bastian*, 765 P.2d 902, 904 (Utah 1988))); *see also Andrews*, 843 P.2d at 1030; *State v. Hanson*, 627 P.2d 53, 56 (Utah 1981); *State v. Nance*, 20 Utah 2d 372, 438 P.2d 542, 544 (1968).[3] We have also held that a statutory scheme for the imposition of a capital sentence must be "structured to provide reasonably that the unique and irretrievable sanction of death will be mandated by its provisions and processes only in extreme and unusually serious and shocking crimes." *Pierre*, 572 P.2d at 1356, *quoted in Young*, 853 P.2d at 402 (Durham, J., dissenting). These statements suggest that proportionality must be part of the analysis of punishments under article I, section 9 of the Utah Constitution.

■ In interpreting the state constitution, we look primarily to the language of the constitution itself but may also look to "historical and textual evidence, sister state law, and policy arguments in the form of economic and sociological materials to assist us in arriving at a proper interpretation of the provision in question." *Society of Separa-* *tionists*, 870 P.2d at 921 n. 6. An examination of Utah's cruel and unusual punishments clause in light of these factors confirms that our limited case law on this issue to date has correctly identified the essence of section 9 jurisprudence: that the legislative power to prescribe punishment for criminals must be circumscribed by the principle of proportionality.

**1. The Language of Article I, Section 9 and Penal Policy**

■ My own reading of the language of article I, section 9 suggests that a punishment, to avoid being unconstitutionally cruel, may not be excessive or grossly disproportionate to the crime it is designed to punish. Although the words "cruel and unusual punishments" do not lend themselves to ready interpretation,[4] I cannot avoid addressing the actual constitutional language. I begin by attempting to understand what is meant by the word "cruel." While many definitions are possible, *Webster's* is representative of what is understood by the word in modern usage:

> disposed to inflict pain esp[ecially] in a wanton, insensate, or vindictive manner: pleased by hurting others: sadistic: devoid of kindness . . .: arising from or indicative of an inclination to enjoy another's pain or misfortune . . .: bitterly conducted: devoid of mildness: causing or conducive to injury, grief, or pain . . .: stern, rigorous, and grim: unrelieved by leniency or softness . . .: severe, distressing: extremely painful: extreme. . . .

*Webster's Third New International Dictionary* 546 (1961). Such a definition clearly encompasses torture and other barbarous methods of punishment. But to the extent that cruelty is defined as that which is

---

**3.** The cases before us challenge section 76–5–103.5(2)(b) on its face, not as applied, but the present challenge illustrates how a statutory penalty may be so disproportionate to the crime it is meant to punish that it shocks the moral sense even when contemplated in the abstract.

**4.** The comments of members of the first federal Congress indicate some of the confusion the phrase engendered in them:

> Mr. Smith, of South Carolina, objected to the words "nor cruel and unusual punishments;"

the import of them being too indefinite. Mr. Livermore [of New Hampshire] opposed the adoption of the clause, saying:

> The clause seems to express a great deal of humanity, on which account I have no objection to it; but it seems to have no meaning in it, I do not think it necessary. . . .

1 Annals of Congress 782–83 (1789), *quoted in Weems v. United States*, 217 U.S. 349, 368–69, 30 S.Ct. 544, 549–50, 54 L.Ed. 793 (1910).

"stern" or anything "causing or conducive to injury, grief, or pain," any punishment administered by the State is by definition cruel. While all punishments may thus be cruel in some sense, the State's infliction of a given level of "cruelty" upon convicted criminals is deemed acceptable, even just. At worst, such cruelty is a necessary evil. But when the State causes suffering that is "wanton, insensate, or vindictive," when it inflicts punishment in a spirit of bitterness or sadism, it can no longer be called necessary. Such is the case when the suffering inflicted by the State exceeds what can be justified by appeal to the legitimate penal goals of the State. This " 'unnecessary and wanton infliction of pain' " constitutes a level of cruelty that is forbidden by our constitutional provision against cruel and unusual punishments. *Bott v. DeLand,* 922 P.2d 732, 740 (Utah 1996) (quoting *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). Such a punishment is "a gratuitous infliction of pain. It advances none of the objectives of the criminal law. It is the infliction of pain for an irrational reason and is cruel and unusual." *State v. Herrera,* 895 P.2d 359, 386 (Utah 1995) (Stewart, Assoc.C.J., dissenting) (describing statute permitting punishment of the insane). A punishment thus becomes unconstitutionally cruel when the suffering inflicted by the State exceeds what is necessary to serve the legitimate "objectives of the criminal law."

■ "The traditional justifications for punishment in the criminal law include retribution, incapacitation, deterrence, and rehabilitation." *Herrera,* 895 P.2d at 388–89 (Durham, J., dissenting); *see also Bishop,* 717 P.2d at 265. A death penalty obviously does not serve the purpose of rehabilitation, but punishments under the criminal law may serve one or many purposes, and the State is not prohibited from punishing an individual for purposes other than rehabilitation. *Bishop,* 717 P.2d at 268. An appeal solely to the principle of deterrence should also be foreclosed, however, because while deterrence may be a legitimate objective of the criminal law, it is problematic as a measure of the excessiveness of punishment under the cruel and unusual punishments clause. Deterrence-based arguments are foreclosed because even punishments that are clearly excessive and unnecessarily cruel can easily be justified under principles of deterrence. For example, if fines are a good way to deter people from littering the streets or public parks, deterrence theory would conclude that stiffer fines or prison sentences would be even more effective. Pushing this principle to its ultimate conclusion, the deterrent effect of the law would be even stronger if the State enforced litter laws with the death penalty—deterrence might even be perfect. But such a punishment is obviously and unconstitutionally cruel—the evil it inflicts is far greater than the evil it seeks to prevent. Although the death penalty might serve as a highly effective deterrent for litterbugs, such effectiveness is purchased at the price of injustice and excessive cruelty. *See Commonwealth v. Jackson,* 369 Mass. 904, 344 N.E.2d 166, 173–74 (1976) ("[A] penalty designed solely or primarily to deter may be so excessive in comparison to other punishments for more serious crimes as to constitute cruel and unusual punishment."); *People v. Broadie,* 37 N.Y.2d 100, 371 N.Y.S.2d 471, 478, 332 N.E.2d 338, 344 (1975) ("Littering or speeding, for example, would certainly be diminished by the threat of severe punishments, but they are relatively minor offenses to which penalties of the kind imposed for [serious felonies] would be readily recognized as grossly disproportionate."). Deterrence is an acceptable goal of punishment, but because it cannot account for constitutional prohibitions against excessive punishments, it is not a good tool for measuring the proportionality of a punishment under the cruel and unusual punishments clause.

■ The principles of rehabilitation and incapacitation present similar theoretical difficulties when used to justify the infliction of punishment. Under each of these theories, the State finds itself inflicting a greater or lesser degree of suffering on an individual, *not* on the basis of the criminal acts committed by that person, but in the interest of other social and utilitarian goals of the state. According to Immanuel Kant, "Juridical punishment can never be administered merely as a means of promoting another good either

with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime." Immanuel Kant, *The Philosophy of Law* (W. Hastie tr. 1887), *in* Sanford H. Kadish & Stephen J. Schulhofer, *Criminal Law and Its Processes* 137 (5th ed.1989). Likewise, Robert Pugsley observes:

> There are four commonly accepted goals of criminal punishment: Retribution, deterrence, rehabilitation, and incapacitation/isolation. However, only retributivism contains a valid philosophical premise upon which a coherent, organized system of just punishment can be built. It is the sole penal rationale concerned exclusively with doing justice. A retributive punishment scheme is not inherently incompatible with other enumerated penal goals. Indeed, any incidental deterrent, rehabilitative, or preventive effects which result from just punishment are certainly welcome. However, these additional social-utilitarian goals cannot morally justify the imposition of criminal sanctions.

Robert A. Pugsley, *Retributivism: A Just Basis for Criminal Sentences*, 7 Hofstra L.Rev. 379, 381 (1979) (footnotes omitted), *quoted in Herrera*, 895 P.2d at 389 n. 2 (Durham, J., dissenting). While the legislature is free to enact punishments aimed at addressing many policy concerns, none of those concerns justifies punishment that inflicts suffering beyond that which the particular crime or criminal may deserve. I do not repudiate these incidental goals of criminal justice but maintain that a punishment must at least be justifiable in terms of retributive justice—that is, it must represent the "just deserts" of the criminal act—in order to avoid invalidation as an excessive punishment that is cruel and unusual under article I, section 9 of the Utah Constitution. *See Herrera*, 895 P.2d at 390 (Durham, J., dissenting) (arguing that undeserved punishment is cruel and unusual punishment). This policy of retribution is central to any well-reasoned theory of justice and necessarily incorporates the principle that punishment should be proportioned to crime under the cruel and unusual punishments clause.

### 2. The History of Article I, Section 9 and Sister State Law

Although the history of the enactment of article I, section 9 does not manifestly invoke the concept of proportionality in punishment, the record of the adoption of Utah's Declaration of Rights invites us to incorporate the rights adopted by sister states with similar constitutional provisions and thereby suggests that proportionality analysis should govern our interpretation of article I, section 9.

The "cruel and unusual punishments" language of article I, section 9, like many of the provisions of article I, was adopted by Utah's Constitutional Convention without any discussion. *See Official Report of the Proceedings and Debates of the Convention Assembled at Salt Lake City on the Fourth Day of March, 1895, to Adopt a Constitution for the State of Utah* 257–58, 492, 1718, 1856 (1898) [hereinafter *Proceedings of the Constitutional Convention*]. Nevertheless, comments by members of the convention suggest an intention to incorporate into article I of the Utah Constitution—the "Declaration of Rights"— the same rights that had been developed throughout the history of the common law and had been preserved in the constitutions of other states. Heber M. Wells, who headed the convention's Committee on the Preamble and Declaration of Rights, said in introducing the Declaration of Rights to the full Constitutional Convention:

> [A] constitution should not be a code of laws, but rather the magna charta of our liberties, upon which the laws may be afterwards founded.... Our desire is that the people of this commonwealth shall have all the rights and all the privileges enjoyed by the people of the other states of this Union, all the rights which a free and enlightened people, who have been too long kept in territorial bondage, have the right to expect.

*Id.* at 200. To this end, the drafters relied heavily on the constitutions of other recently admitted states as models or patterns for the Utah Constitution. *See Society of Separationists*, 870 P.2d at 928–29 & n. 31 (citing John J. Flynn, *Federalism and Viable State Government—The History of Utah's Consti-*

*tution,* 1966 Utah L.Rev. 311, 323; Martin B. Hickman, Utah Constitutional Law 72–74 (unpublished Ph.D. dissertation, University of Utah); Brad C. Smith, Comment, *Be No More Children: An Analysis of Article I, Section 4 of the Utah Constitution,* 1992 Utah L.Rev. 1431, 1454). The comments of delegate Wells suggest that in construing Utah's Declaration of Rights it is appropriate to look at the rights retained by citizens of other states under similar constitutional provisions against cruel and unusual punishments.

A prohibition against cruel and unusual punishments appears in forty-four of the fifty state constitutions as well as the Constitution of the United States, and similar prohibitions appear in three others.[5] The first American use of the language was in section 9 of the Virginia Declaration of Rights, and the language was subsequently adopted by eight other states before it became the Eighth Amendment to the United States Constitution. Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning,* 57 Cal. L.Rev. 839, 840 (1969) [hereinafter Granucci]. It is generally believed that at the time these first American constitutions were ratified, the cruel and unusual punishments clause was understood to prohibit only certain methods of punishment, including torture, that were deemed barbaric. *See Furman v. Georgia,* 408 U.S. 238, 319, 92 S.Ct. 2726, 2767, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring); *Bott,* 922 P.2d at 737–38; *Broadie,* 371 N.Y.S.2d app. at 483, 332 N.E.2d app. at 347; Granucci at 841–42 (citing 2 J. Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 111 (2d ed. 1881); 3 J. Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 447–48, 452 (2d ed. 1881); 1 Annals of Congress 782–83 (1789)). *But see Weems v. United States,* 217 U.S. 349, 372–73, 30 S.Ct. 544, 551, 54 L.Ed. 793 (1910) ("[S]urely [the framers] intended more than to register a fear of the forms of abuse that

went out of practice with the Stuarts."); Malcolm E. Wheeler, *Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment,* 24 Stan. L.Rev. 838, 853–54 (1972). Legal scholars and jurists continued to accept this understanding of the phrase throughout the nineteenth century despite occasional attempts to expand the cruel and unusual punishments clause to prohibit punishments deemed disproportionate to the crime. Granucci at 842 (citing 1 T. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 694 (8th ed.1927); Note, *The Cruel and Unusual Punishment Clause and the Substantive Criminal Law,* 79 Harv. L.Rev. 635 (1966)). Utah's Constitutional Convention may have shared this assumption about the limited application of the clause when it adopted the prohibition against "cruel and unusual punishments" in 1896, or it may simply have adopted it, as Professor Granucci suggests many states did, as "constitutional 'boilerplate.'" *Id.* at 840.

In any case, I would reaffirm that punishment involving torture or other barbarities is unconstitutionally cruel, but I would not limit the meaning of "cruel and unusual punishments" under article I, section 9 to what we suppose the framers of our constitution may have understood about that phrase. Indeed, doing so would violate the expressed intent of the framers themselves. Charles Varian, the acting president of the Constitutional Convention, articulated the understanding of the members of the convention that Utah's Declaration of Rights was never meant to establish a comprehensive or positive law but merely to reaffirm various natural rights that exist independent of any constitution:

We start, you will remember, with the understanding that we do not need, first, to make any declaration [of rights] in this Constitution at all. We are all agreed that as it is usual and customary to do so, it is better to do so, perhaps.... It [the Declaration of Rights] is simply, as it is af-

---

5. Only the constitutions of Connecticut, Illinois, and Vermont do not contain a guarantee that cruel and unusual punishments shall not be inflicted. The constitutions of Delaware and Washington forbid "cruel punishments," Del.

Const. art. I, § 17; Wash. Const. art. I, § 14, and the South Carolina Constitution requires that neither "cruel, nor corporal, nor unusual punishment be inflicted." S.C. Const. art. I, § 15.

firmed in the opening statement of this very preamble and declaration of rights, a reaffirmation of what has always been in this country and in England since the days of magna charta.

. . . .

[I]t is apparent, Mr. President, that a constitution is not beginning of government. Government existed before the constitution. It is not the origin of all these rights, or privileges if you please, that are affirmed and declared in it and are protected in it or by it. Mr. Cooley says:

In considering state constitutions, we must not commit the mistake of supposing that because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the power of the rulers, but they do not measure the rights of the government: What is a constitution and what are its objects? It is easier to tell what it is not than what it is. It is not the beginning of a community nor the origin of private rights. It is not the fountain of law nor the incipient state of government. It is not the cause, but consequence, of personal and political freedom. It grants no rights to the people, but is the creature of their power, the instrument of their convenience, designed for their protection, in the acknowledgment of the rights and powers which they possessed before the constitution was made. It is but the framework of the political government and necessarily based upon the pre-existing conditions of laws, rights, habits, and modes of thought. There is nothing primitive in it. It is all derived from a known source. It pre-supposes an organized society, law, order, property, personal freedom and love of political liberty, and enough of cultivated intelligence to know how to guard it against the encroachments of tyranny.

*Proceedings of the Constitutional Convention* at 643. The faith in natural rights exhibited by Charles Varian and other delegates to the Constitutional Convention is also reflected in their description of article I as a Declaration of Rights rather than a Bill of Rights and by their adoption, in the first section of that article, of language stating not that the constitution conferred rights, but that "[a]ll men have the *inherent and inalienable* right to enjoy and defend their lives and liberties . . . ." Utah Const. art. I, § 1 (emphasis added). Part of our duty in construing section 9 is to identify the inherent "rights and powers which [the people] possessed before the constitution was made" and which are "acknowledged" in the phrase "nor shall cruel and unusual punishments be inflicted." *Proceedings of the Constitutional Convention* at 643 & Utah Const. art. I, § 9.

The difficulty with applying a theory of natural or inherent rights to specific cases, however, is that while we may accept that natural rights exist "out there," those rights are impossible to identify and defend without at least some articulation in the positive law. We may acknowledge the existence of natural rights, but as a judiciary we cannot enforce such rights, particularly when they challenge laws enacted by a democratically elected legislature, until those rights are positively set down in a constitutional document. We are not free to overturn legislation on the basis of previously unknown "natural rights" which we have independently identified, but we are free, and in fact our duty requires us, to interpret existing constitutional language to the best of our ability in conformity with the meaning of that language as we understand it and as we conceive the framers meant it to be understood. The constitutional delegates' appeal to natural law simply invites us to broaden our understanding of the language used in the Declaration of Rights of the Utah Constitution beyond the limited context and understanding of Salt Lake City in 1895 to include meanings suggested by the language in the broader social and historical context of the common law and of democracy itself.

One well-established interpretation of the prohibition against "cruel and unusual punishments," which is now generally believed to have been the original meaning of that phrase, is that it should prohibit punishments disproportionate to the crime being punished. Granucci at 860. Although the notion of

proportional punishments is of ancient origin,[6] the first use of the phrase "cruel and unusual punishments" was in the English Bill of Rights of 1689. *Id.* at 852–53, 855 (citing R. Perry, *Sources of Our Liberties* 245–47 (1959)). After examining the contemporary historical evidence, Professor Granucci concludes that the phrase originally meant something very different from what the eighteenth century drafters of American constitutions assumed:

> The English evidence shows that the cruel and unusual punishments clause of the Bill of Rights of 1689 was first, an objection to the imposition of punishments which were unauthorized by statute and outside the jurisdiction of the sentencing court [these are presumably the "unusual" punishments described in the clause], and second, a reiteration of the English policy against disproportionate penalties.

*Id.* at 860.

The notion that excessive or grossly disproportionate punishments are unconstitutionally cruel has been adopted by numerous American jurisdictions under the cruel and unusual punishments clauses of their various constitutions. *See, e.g., Weems v. United States,* 217 U.S. 349, 367–81, 30 S.Ct. 544, 549–55, 54 L.Ed. 793 (1910); *State v. Taylor,* 82 Ariz. 289, 312 P.2d 162, 166 (1957); *In re Lynch,* 8 Cal.3d 410, 105 Cal.Rptr. 217, 226, 503 P.2d 921, 930 (1972); *State v. Kelly,* 106 Idaho 268, 678 P.2d 60, 71 (App.1984); *Commonwealth v. Alvarez,* 413 Mass. 224, 596 N.E.2d 325, 330–32 (1992) (citing *McDonald v. Commonwealth,* 173 Mass. 322, 53 N.E. 874 (1899)); *People v. Lorentzen,* 387 Mich. 167, 194 N.W.2d 827, 829–32 (1972); *State v. Padilla,* 85 N.M. 140, 509 P.2d 1335, 1338 (1973); *People v. Thompson,* 83 N.Y.2d 477, 611 N.Y.S.2d 470, 471–73, 633 N.E.2d 1074, 1075–76 (1994) (citing *Broadie,* 371 N.Y.S.2d at 475–76, 332 N.E.2d at 341–42); *Sustar v. County Court,* 101 Or. 657, 201 P. 445, 447–48 (1921). Some find authority for this construction in the word "unusual." *Lorentzen,* 194 N.W.2d at 829. Others have noted that the inclusion of the phrase in a constitutional provision also containing prohibitions against excessive bail and excessive fines implies that the entire section is a prohibition against excessive penalties, including excessive criminal punishments that might be characterized as cruel and unusual. *See In re Lynch,* 105 Cal.Rptr. at 224, 503 P.2d at 928 (Field, J., dissenting) (" 'The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted.' " (quoting *O'Neil v. Vermont,* 144 U.S. 323, 339–40, 12 S.Ct. 693, 699–700, 36 L.Ed. 450 (1892))). Still others have been content to adopt the reasoning of the United States Supreme Court in *Weems,* where it interpreted the Eighth Amendment's language prohibiting cruel and unusual punishments to preclude disproportionate punishment. *Padilla,* 509 P.2d at 1338; *Sustar,* 201 P. at 447–48.

■ I would likewise hold that a disproportionately harsh punishment may be unconstitutionally cruel or unusual under article I, section 9 of the Utah Constitution, but would base this holding on the widespread acceptance of proportionality analysis in interpreting cruel and unusual punishments clauses in other states' constitutions and the expressed intention of Utah's constitutional delegates that the citizens of Utah should share the same inherent and inalienable rights as the citizens of other states. *See Proceedings of the Constitutional Convention* at 200, 643; *see also Society of Separationists,* 870 P.2d at 921 n. 6 ("We have encouraged parties briefing state constitutional issues to use ... sister state law [among other things] ... to assist us in arriving at a proper interpretation of the provision in question."). Furthermore, my own understanding of the meaning of the word "cruel" and my view of the moral policy considerations implicated by the theory of punishment both support a rule requiring that punishments be measured proportionally to the crime. Justice Stewart and I would

---

**6.** *See* Arthur B. Berger, Note, *Wilson v. Seiter: An Unsatisfying Attempt at Resolving the Imbroglio of Eighth Amendment Prisoners' Rights Standards,* 1992 Utah L.Rev. 565, 567 (citing sources of proportional punishment principle in Old Testament law of *lex talionis* and in writings of Aristotle, as well as in Anglo–Saxon, Germanic, and Norse law), *cited in Bott,* 922 P.2d at 737 n. 2.

therefore reaffirm the principle of proportionality and would hold that to avoid invalidation as a cruel and unusual punishment under article I, section 9 of the Utah Constitution, a punishment inflicted by the State must be measured proportionally to the offense it is intended to punish.

### B. Applying Utah's Cruel and Unusual Punishments Clause: Enforcing the Principle of Proportionality

I next evaluate the capital punishment provision of section 76–5–103.5(2)(b) of the Utah Code in terms of its proportionality vis-à-vis the crime of aggravated assault by a first degree felony prisoner resulting in the intentional infliction of serious bodily injury. In assessing the proportionality of a given punishment, this court has held, "What constitutes an adequate penalty is a matter of legislative judgment and discretion, unless the penalty prescribed is clearly and manifestly cruel and unusual." *Nance,* 438 P.2d at 544; *see also State v. Green,* 757 P.2d 462, 463–64 (Utah 1988) (citing *Mutart v. Pratt,* 51 Utah 246, 170 P. 67, 68 (1917)); *Bishop,* 717 P.2d at 263–64; *In re Lynch,* 105 Cal. Rptr. at 226, 503 P.2d at 930; *Alvarez,* 596 N.E.2d at 330–31; *Broadie,* 371 N.Y.S.2d at 474 & app. at 487, 332 N.E.2d at 341 & app. at 350. Legislative discretion in this area is thus limited by the constitution, and we have held that the constitution is violated when punishments become so disproportionately harsh that "the sentence imposed [or proposed] in proportion to the offense committed [or alleged] is such as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances." *Monson,* 928 P.2d at 1024 (citations omitted).

Similar articulations of the proportionality principle have evolved in other jurisdictions, but each describes an equally subjective standard and none lends itself to easy application. *See, e.g., Faulkner v. State,* 445 P.2d 815, 819 (Alaska 1968) (invalidating punishment so disproportionate " 'as to be completely arbitrary and shocking to the sense of justice' " (quoting *Green v. State,* 390 P.2d 433, 435 (Alaska 1964))); *State v. Espinosa,* 101 Ariz. 474, 477, 421 P.2d 322, 325 (1966) (punishment may not be "so disproportionate to the offense committed as to shock the moral sense of the community"); *Lynch,* 105 Cal.Rptr. at 226, 503 P.2d at 930 (punishment is constitutionally disproportionate if it "shocks the conscience and offends fundamental notions of human dignity"); *Normand v. People,* 165 Colo. 509, 440 P.2d 282, 284 (1968) (upholding punishment "where it does not shock the conscience of the court"); *State v. Evans,* 73 Idaho 50, 245 P.2d 788, 792 (1952) (penalty invalidated if so disproportionate "as to shock the conscience of reasonable men"); *Workman v. Commonwealth,* 429 S.W.2d 374, 377 (Ky.1968) (punishment may not be "so disproportionate to the offense committed as to shock the moral sense of the community"); *Alvarez,* 596 N.E.2d at 331 (punishment is constitutionally disproportionate if it "shocks the conscience and offends fundamental notions of human dignity"); *Lorentzen,* 194 N.W.2d at 831 (punishment may not be so disproportionate " 'as to shock the moral sense of the public' " (quoting *People v. Mire,* 173 Mich. 357, 138 N.W. 1066, 1068 (1912))); *Cannon v. Gladden (In re Cannon),* 203 Or.629, 281 P.2d 233, 235 (1955) (punishment unconstitutional if so disproportionate "as to shock the moral sense of all reasonable men as to what is right and proper"). Faced with the difficulty of applying these subjective standards, courts have developed more objective tests. *See Broadie,* 371 N.Y.S.2d at 475, 332 N.E.2d at 342 (declining to discuss "extent to which the conscience of the court is shocked by punishments imposed ... [b]ecause such a subjective test has obvious weaknesses in trying to apply a rational analysis").

The objective tests developed in other jurisdictions to assess the proportionality of punishments generally focus on three factors. First, courts look to "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." *Lynch,* 105 Cal.Rptr. at 226, 503 P.2d at 930; *see also Alvarez,* 596 N.E.2d at 331; *Lorentzen,* 194 N.W.2d at 831; *Broadie,* 371 N.Y.S.2d at 475, 332 N.E.2d at 342. As part of this analysis, many courts examine the penal objectives manifested in the statutory scheme. *See, e.g., Jackson,* 344 N.E.2d at 171; *Broadie,* 371 N.Y.S.2d at 477, 332 N.E.2d at 343. Next, many courts "compare

the challenged penalty with the punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious." *Lynch,* 105 Cal. Rptr. at 227, 503 P.2d at 931; *see also Alvarez,* 596 N.E.2d at 331, 332; *Lorentzen,* 194 N.W.2d at 831–32; *Broadie,* 371 N.Y.S.2d at 475, 478–81, 332 N.E.2d at 342, 344–45. Finally, these courts conduct "a comparison of the challenged penalty with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision." *Lynch,* 105 Cal.Rptr. at 228, 503 P.2d at 932; *see also Alvarez,* 596 N.E.2d at 331, 332; *Lorentzen,* 194 N.W.2d at 832–33; *Broadie,* 371 N.Y.S.2d at 475, 479, 332 N.E.2d at 342, 345.[7] These comparative tests also give meaning to the word "unusual" in section 9's cruel and unusual punishments clause. Examining the capital felony provisions of section 76–5–103.5(2)(b) in light of these factors indicates that the death penalty is disproportionately harsh for the crime of aggravated assault by a prisoner, even when that prisoner is serving a sentence for a first degree felony and intentionally causes serious bodily injury.

As to the first factor, aggravated assault resulting in the intentional infliction of serious bodily injury is clearly a serious crime. The Utah Code defines "serious bodily injury" as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." Utah Code Ann. § 76–1–601(10). A perpetrator must be more than ordinarily violent to inflict such injuries upon another intentionally. Never-

theless, aggravated assault committed by a nonprisoner, even when he or she intentionally causes serious bodily injury, is classified only as a third degree felony, punishable by imprisonment of zero to five years. Utah Code Ann. §§ 76–3–203(3), 76–5–103 (1995).[8]

Gardner and Simmons do not challenge the State's provision for punishing aggravated assault under section 76–5–103 but challenge only the dramatic enhancement provisions of section 76–5–103.5, which punish prisoners who commit this crime, and in particular section –103.5(2)(b), which makes aggravated assault resulting in the intentional infliction of serious bodily injury a capital crime when committed by a first degree felony prisoner. The serious assault treated by the statute becomes arguably more serious when committed by a prisoner serving a sentence for a first degree felony, but I am not persuaded that this additional circumstance is sufficiently aggravating to justify an enhancement of the punishment for aggravated assault from a third degree felony, or even a second degree felony, to a capital felony.

The State asserts that the degree of danger presented to society increases dramatically when an aggravated assault occurs in prison rather than outside the prison or when it is perpetrated by a prisoner serving a sentence for a first degree felony rather than a nonprisoner or a prisoner serving a lesser sentence. Given the presumption of constitutionality that we apply to legislative judgments, I accept as reasonable the proposition that a prison environment presents special security problems and that an aggravated assault that takes place within what

---

7. Interestingly, subsequent to *Lynch* the United States Supreme Court adopted a strikingly similar three-part test for evaluating the proportionality of punishments under the Eighth Amendment:

    In sum, a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Solem v. Helm,* 463 U.S. 277, 292, 103 S.Ct. 3001, 3010, 77 L.Ed.2d 637 (1983). We have employed this test in evaluating claims of cruel

and unusual punishment under the federal constitution. *See Monson,* 928 P.2d at 1024; *Bishop,* 717 P.2d at 269. Our adoption of the *Lynch* factors for state constitutional analysis would confirm our holding in previous cases that the standard of proportionality adopted by this court does not differ substantially from the Eighth Amendment standard. *Andrews,* 843 P.2d at 1030; *see also Young,* 853 P.2d at 358.

8. A 1995 amendment reclassified aggravated assault as a second degree felony, punishable by a term of one to fifteen years, when the perpetrator "intentionally causes serious bodily injury to another." Utah Code Ann. § 76–5–103(2) (Supp. 1996).

the State calls "the violent and tension filled walls of a prison" may be more likely to result in additional or uncontrolled violence than a similar assault that occurs elsewhere.

However, section 76–5–103.5 is not tailored to apply only within the confines of prison. Unlike other statutes that provide enhanced penalties for crimes "committed by a person who is confined in a jail or other correctional institution," *see, e.g.,* Utah Code Ann. § 76–5–202(1)(a), section 76–5–103.5 applies to "[a]ny prisoner," and the Code defines "prisoner" as

> any person who is in custody of a peace officer pursuant to a lawful arrest or who is confined in a jail or other penal institution or a facility used for confinement of delinquent juveniles operated by the Division of Youth Corrections regardless of whether the confinement is legal.

Utah Code Ann. § 76–5–101. By including "any person who is in the custody of a peace officer" within the definition of "prisoner," section 76–5–101 makes the prisoner enhancement provisions of section 76–5–103.5 applicable to some situations outside the walls of prison. Security concerns similar to those existing in prisons may exist in the other situations described by section 76–5–101, but the State's reference to the violent conditions existing in prison populations cannot justify a dramatic sentence enhancement that also applies in nonprison situations.

Furthermore, concerns about the danger presented to society do nothing to explain why an assault by a prisoner serving a sentence for a first degree felony should lead to a capital conviction when the identical assault would be classified as merely a second degree felony, punishable by a sentence of one to fifteen years, if committed by a prisoner serving a sentence for a crime other than a first degree felony. *Compare* Utah Code Ann. § 76–5–103.5(1) with *id.* § 76–5–103.5(2)(b). I can conclude only that any increased danger to society associated with section 76–5–103.5 is attributable solely to that section's requirement that the assault be committed by a prisoner, not to the prisoner's status as a first degree felon.

This presents the question whether there is any other reasonable basis for the statute to distinguish prisoners who have been incarcerated for first degree felonies from other prisoners in order to give them harsher sentences. We cannot assume that these prisoners are more violent than other prisoners because the first degree felony requirement does not restrict the eligible defendants to those who have committed violent crimes. For example, it is a first degree felony in Utah to "present any credit card sales draft to the issuer for payment pertaining to any sale ... which was not made by the authorized credit card merchant" when "the value of the property, money, or thing obtained ... is $100,000 or more." Utah Code Ann. §§ 76–6–506.5 & –506.6. It is also a first degree felony "to knowingly or intentionally ... conspire with or aid another to engage in a clandestine laboratory operation" if such laboratory "actually produced any amount of a specified controlled substance." *Id.* §§ 58–37d–4(1)(e) & –5(f). Various other crimes in the Utah Code are designated as first degree felonies but are not indicative of any predisposition or tendency toward violence that might justify a capital sentence. *See, e.g., id.* § 76–10–1801 (communications fraud involving $100,000 or more); *id.* § 58–37–8(1)(b)(I) (second conviction for possession of a controlled substance with intent to distribute). If the legislature had intended to increase the penalty for those defendants previously convicted of violent crimes, it could easily have done so. Section 76–5–202(1)(h), for example, provides enhanced punishment for a murderer who "was previously convicted of aggravated murder, murder, or of a felony involving the use or threat of violence to a person." It is therefore difficult to read the first degree felony requirement of section 103.5(2)(b) as a design to isolate or incapacitate habitually violent criminals.

I accept, however, that a prisoner's status as a first degree felon may indicate something about that prisoner's state of mind when he or she commits an aggravated assault. A prisoner serving a sentence for a first degree felony has already been convicted of a serious crime and has usually been given a long prison sentence. Again, employing a presumption in favor of the legislative judgment, one might presume that such

a prisoner's willingness to engage in further violent activity while incarcerated indicates a lack of remorse or an attitude of indifference to or defiance of conventional methods of punishment. One might reasonably assume that this kind of prisoner presents an increased risk to society.

The State argues that "a punishment that may constitute disproportional punishment for an ordinary citizen ... may be the only adequate punishment for a prisoner committing the same offense within prison walls." It also argues that the requirement of a serious bodily injury intentionally caused and the fact that the assault must take place in prison "may well render any punishment other than death eligibility inadequate to deter future violence." I accept the State's argument and the presumed legislative judgment that prison society is "fundamentally more dangerous than free society" and that "[t]his inherent difference between a free society of generally law-abiding individuals and an incarcerated society of outlaws warrants withholding from prisoners many of the rights and privileges of ordinary citizens," but the State sweeps too broadly when it concludes that a prisoner's inalienable rights, including the right to life and the right to be free from cruel and unusual punishments, are thereby compromised. While the dangers of prison society mandate certain precautionary measures, a person does not give up his or her right to be free from cruel and unusual punishments while in prison. *See Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

The State's argument that the inherent dangerousness of prison society necessitates the dramatic enhancement in punishments for prisoners under section –103.5 suggests that the enhanced sentencing provisions are necessary for the deterrence or isolation/incapacitation of otherwise unresponsive prisoners. Insofar as the State implies that capital punishment is justifiable as a deterrent against aggravated assault by a prisoner, I recognize the potentially deterrent effect of the statute but reject it as a helpful way of measuring the statute's proportionali-

ty. The death penalty would deter many crimes that are not so serious as to require "the unique and irretrievable sanction of death"; but rules of proportionality mandate that this punishment be imposed "only in extreme and unusually serious and shocking crimes." *Pierre*, 572 P.2d at 1356.

To gauge the proportionality or necessity of capital punishment in this case, I will compare the penalty for aggravated assault by a prisoner with the punishments prescribed under Utah's criminal code for other offenses that are more serious in terms of the ruthless violence involved in their commission and the danger they pose to society. *See Lynch*, 105 Cal.Rptr. at 227, 503 P.2d at 931. In addition, I will look particularly closely at Utah's enhanced punishment provisions for prisoners and repeat offenders as an indication of what level of punishment enhancement is generally considered appropriate or proportionate for prisoners who display indifference to punishment, like those prisoners already serving sentences for first degree felonies who nevertheless commit serious aggravated assaults.

The most obvious comparison is with murder, which is classified as a first degree felony, punishable by an indeterminate prison term of five years to life. Utah Code Ann. §§ 76–5–203, 76–3–203(1). While the infliction of serious bodily injury required for a capital conviction under section 76–5–103.5(2)(b) evinces a serious tendency toward violence, I cannot say that the perpetrator's intent is worse than the intent of a murderer who may "intentionally or knowingly cause the death of another" and yet not incur a capital conviction. *Id.* § 76–5–203(1)(a). Likewise, attempted murder, which also requires an intent to kill or a knowledge that one's acts would result in death if carried out, *State v. Johnson*, 821 P.2d 1150, 1156–57 (Utah 1991), arguably displays a more depraved mind and greater disposition toward violence than aggravated assault with the intentional infliction of serious bodily injury, but it is only a second degree felony, punishable by a term of one to fifteen years. *Id.* §§ 76–4–102, 76–3–203(2). It cannot be said that the harm to society resulting from murder is less than that resulting from aggravat-

ed assault with the intentional infliction of serious bodily injury. Even when such an assault occurs in prison, the worst that can be said is that the risk of further violence, or even death, increases. But clearly an increased *risk* of violence or death does not harm society as much as the *accomplishment* of a murder. Likewise, while the intentional infliction of serious bodily injury upon another is deplorable, one cannot say it is worse than actually causing that death intentionally or knowingly. Thus, under this statute, aggravated assault by a prisoner resulting in the intentional infliction of serious bodily injury is punished more harshly than murder and attempted murder, which by definition are more serious crimes in terms of the harm done to society and the depraved intent exhibited by the perpetrator.

The capital punishment provisions of section 76–5–103.5(2)(b) also appear disproportionate by comparison with the punishment for other crimes set forth in the Code that also cause greater harm to society. Other first degree felonies punished less harshly than aggravated assault by a prisoner under section –103.5(2)(b) include rape, *id.* § 76–5–402; rape of a child, § 76–5–402.1; forcible sodomy, § 76–5–403; sodomy on a child, § 76–5–403.1; aggravated sexual abuse of a child (which may include bodily injury to the victim), § 76–5–404.1; and aggravated sexual assault (which also may include bodily injury to the victim), § 76–5–405.

Similarly, the prisoner enhancements set forth in section 76–5–103.5 are disproportionately harsh by comparison to comparable enhancement provisions. An intentional or knowing murder may become aggravated murder—the only crime (other than aggravated assault by a prisoner) that is classified as a capital felony under Utah's criminal code—only when accompanied by one or more aggravating circumstances. Utah Code Ann. § 76–5–202(2). Many of the aggravating circumstances set forth in the aggravated murder section stand in relevant contrast to the circumstances that can trigger a capital sentence under the statute for aggravated assault by a prisoner. For instance, murder becomes aggravated murder when

(a) the homicide was committed by a person who is confined in a jail or other correctional institution; ... (h) the actor was previously convicted of aggravated murder, murder, or of a felony involving the use or threat of violence to a person ...; (p) the actor was under a sentence of life imprisonment or a sentence of death at the time of the commission of the homicide; or (q) the homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death.

*Id.* § 76–5–202(1). These aggravating circumstances thus result in the enhancement of punishments by a single degree—from first degree felony to capital felony. *Id.* § 76–5–202(2). And yet the circumstance of being a prisoner serving a sentence for a first degree felony results, under section 76–5–103.5(2)(b), in an enhancement of *three degrees*—from third degree felony to capital felony. This enhancement is a disproportionately harsh punishment for this particular "aggravating" circumstance, which, by all measures, is less serious than the aggravating factors set forth in section 76–5–202(1)(h), (p), or (q).

It may be argued that the factors set forth for aggravated murder result in an enhancement of a single degree because no harsher punishment is available than the capital punishment provided. However, in other situations in which no such limitation exists, these same aggravating factors still result in sentence enhancements of a single degree. For example, attempted murder, a second degree felony, becomes a first degree felony when accompanied by any of the aggravating factors set forth in section 76–5–202, including attempted commission while in prison, previous conviction of a violent felony, attempt by a life prisoner or a prisoner under a death sentence, or attempted murder involving the infliction of physical torture, serious physical abuse, or serious bodily injury. *Id.* § 76–5–202(1)(a), (h), (p), (q). By enhancing the punishment for aggravated assault from a third degree felony to a capital felony, the capital punishment provision of section –103.5(2)(b) is considerably harsher than the

enhancements provided for unquestionably more serious aggravating circumstances contained in other statutes of our criminal code.

Aggravated assault by a nonprisoner, even when it involves the intentional infliction of serious bodily injury, is a third degree felony incurring an indeterminate sentence of zero to five years. *Id.* § 76–5–103. The escalation of that sentence to a capital felony when the assault is committed by a prisoner serving a sentence for a first degree felony is disproportionately harsh, particularly when attempted murder, which requires the intent to kill or knowledge that one's acts would result in death if carried out, rises only to a first degree felony when accompanied by aggravating circumstances clearly more serious. Justice Stewart and I conclude that the capital felony provision of section 76–5–103.5(2)(b) is disproportionately harsh when compared with the punishments provided for more serious crimes under the Utah Code. We also conclude that the capital felony provision of section –103.5(2)(b) is disproportionally harsh when compared with the enhanced sentencing provisions for comparably aggravating circumstances under other sections of the Code.

Finally, it is illuminating to compare the penalty for aggravated assault by a prisoner with the punishments prescribed for that offense in other jurisdictions having an identical or similar constitutional provision. *See Lynch,* 105 Cal.Rptr. at 228, 503 P.2d at 932. As the parties have pointed out, only one other state, Montana, permits capital punishment for the crime of aggravated assault by a prisoner. *See* Mont.Code Ann. § 46–18–220 (1995).[9] Furthermore, the Arizona Supreme Court, in reviewing a similar statute under a similar constitutional challenge, found in a survey of state penal provisions that only twelve jurisdictions (including Arizona) authorized even a life sentence for dangerous or deadly assault by a prisoner. *State v. Mulalley,* 127 Ariz. 92, 618 P.2d 586,

590 (1980), *overruled on other grounds by State v. Noble,* 152 Ariz. 284, 731 P.2d 1228, 1231 (1987).

Utah's section 76–5–103.5(2)(b), by authorizing the death penalty for aggravated assault by a prisoner, is considerably more harsh than the penalties permitted in any other state except Montana for the crime of aggravated assault by a prisoner, even when the prisoner is serving a sentence for a first degree felony and intentionally causes serious bodily injury. This fact, combined with the fact that the death penalty provision of section 76–5–103.5(2)(b) is more severe than the penalties prescribed by the Utah Code for more serious crimes and aggravating circumstances, leads to the conclusion that the death penalty is disproportionate to the crime of aggravated assault by a prisoner.

The essence of section 9's prohibition against cruel and unusual punishment is the principle of proportionality. Disproportionate punishment does not redress the violence a criminal commits against society; it escalates the violence. Proportionality implies balance and symmetry. *See Webster's New Collegiate Dictionary* 924 (1973). The punishment inflicted on a criminal should reflect the injury he has caused to his victim and to society. Section 76–5–103.5(2)(b) has no such symmetry. Death is the ultimate sanction our system of justice is capable of administering; it must be reserved for crimes of surpassing gravity. *See Pierre,* 572 P.2d at 1356. The State therefore may not use death to punish a crime of lesser magnitude; that is the touchstone of proportionality. While every crime of violence is reprehensible, aggravated assault—even when committed by a prisoner—is not so unusually serious or so shocking as to merit the State's most grievous, unique, and irretrievable sanction. Death is qualitatively different from physical injury, no matter how serious, and a law that punishes with death the crimi-

9. Two other states permit the death penalty for assaults by prisoners, but only with additional aggravating circumstances. Colorado authorizes the death penalty or life imprisonment for a prisoner previously convicted of a class 1 felony who commits a serious assault *during the course of an escape,* Colo.Rev.Stat. §§ 18–3–202 (Supp. 1996), 16–11–103 (Supp.1995), and California permits the death penalty or life imprisonment if a *life prisoner* commits a serious assault *that results in the death of the victim* within one year of the assault. Cal.Penal Code § 4500 (Supp. 1997). Interestingly, the punishment for a similar assault by a prisoner *not* incarcerated for life is an additional sentence of two, four, or six years. *Id.* § 4501 (1982).

nal who has caused only injury to his victim is by definition disproportionate.

Because the death penalty authorized by section 76–5–103.5(2)(b) is disproportionate to the crime of aggravated assault by a prisoner, Justice Stewart and I would hold that provision to be in violation of article I, section 9 of the Utah Constitution and would dispose of the question before us on those grounds. Because a majority of the court has not concurred in this analysis of the Utah State Constitution's cruel and unusual punishments clause, however, this opinion will treat the parallel provision from the Eighth Amendment to the United States Constitution.

## III. THE DEATH PENALTY AND THE EIGHTH AMENDMENT

■ We begin our analysis under the Eighth Amendment by setting forth the appropriate standard of review. For purposes of review under the Cruel and Unusual Punishments Clause of the federal constitution, we presume the validity of a legislative act. *Gregg v. Georgia*, 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976). The State argues that because these cases present a facial challenge to the constitutionality of section 76–5–103.5(2)(b), the prisoners must "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). This argument implies that if we are able to imagine an aggravated assault by a prisoner that is sufficiently horrific to make the death penalty plausible, we must uphold the statute. However, a facial challenge to a statute under the Eighth Amendment's cruel and unusual punishment provision requires a different standard than that applicable under the due process clause at issue in *Salerno*.[10] The standard for a facial challenge on cruel and unusual punishments grounds is set forth in *Gregg v. Georgia*:

[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

428 U.S. at 175, 96 S.Ct. at 2926. While Simmons did in fact raise a due process challenge in the court below, he abandoned it on appeal. The State's reliance on the due process standard—"no set of circumstances exists under which the act would be valid"— is therefore misplaced.

Modern death penalty jurisprudence under the Eighth Amendment begins with the Supreme Court's landmark decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). In *Furman*, the Court struck down capital punishment schemes in Georgia and Texas as violative of the Eighth Amendment. *Id.* at 239, 92 S.Ct. at 2727. Five justices wrote separate concurring opinions in that case, but the holding common to all of them was that "the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." *Godfrey v. Georgia*, 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980) (plurality) (summarizing Court's holding in *Furman*).

In cases following *Furman*, the Supreme Court upheld the death penalty for murder when it was administered under sentencing schemes that narrow the pool of death-eligible defendants and provide statutory guidance to sentencing authorities as to who should actually be sentenced to die. *See, e.g. Gregg*, 428 U.S. at 206–07, 96 S.Ct. at 2940–41 (plurality). In addition to its examination of procedural safeguards, the Court in *Gregg* also engaged in an analysis of whether capi-

---

**10.** *Salerno* contains language that may be read to imply that a person must also "establish that no set of circumstances exists under which the Act would be valid" when challenging a statute under the excessive bail provisions of the Eighth Amendment. *Id.* at 746, 107 S.Ct. at 2101.

However, the Eighth Amendment analysis that actually appears in *Salerno* makes no reference to this rigorous standard of review and addresses only the Excessive Bail Clause of the Eighth Amendment, not the Cruel and Unusual Punishments Clause.

tal punishment is per se cruel and unusual. Justices Brennan and Marshall concluded that it was. *Id.* at 230–31, 241, 96 S.Ct. at 2972–73, 2977. However, a plurality of the *Gregg* Court determined that the death penalty is not necessarily cruel and unusual punishment for the crime of murder. *Id.* at 169, 96 S.Ct. at 2923. At the same time, the Supreme Court in *Gregg* specifically declined to address "the question of whether the taking of the criminal's life is a proportionate sanction where no victim has been deprived of life." *Id.* at 187 n. 35, 96 S.Ct. at 2932 n. 35. In its analysis, the Court established two standards of cruel and unusual punishment against which statutory punishments may be measured.

The first aspect of "cruel and unusual punishment" takes its meaning from contemporary social context. The plurality in *Gregg* wrote that the Eighth Amendment prohibition against cruel and unusual punishment is not a "static concept" but that " '[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Id.* at 172–73, 96 S.Ct. at 2925 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)). While social standards are by nature subjective and changeable, the plurality found that contemporary standards of decency could nevertheless be identified by "objective indicia that reflect the public attitude toward a given sanction." *Id.* at 173, 96 S.Ct. at 2925. These include the willingness of legislatures in various states to enact the sanction and the willingness of juries to impose it. *Id.* at 179–82, 96 S.Ct. at 2928–29.

The second meaning of "cruel and unusual punishment" is not contextual but is based on fundamental principles of humanism. The *Gregg* Court found that "public perceptions of standards of decency with respect to criminal sanctions are not conclusive" but that "[a] penalty must also accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.' " *Id.* at 173, 96 S.Ct. at 2925 (quoting *Trop,* 356 U.S. at 100, 78 S.Ct. at 597). Specifically, the plurality found that the concept of human dignity precludes any punishment that is "excessive," and a punishment is excessive, the Court

found, if it "involve[s] the unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." *Id.* (citations omitted).

■ Justice Stewart and I would conclude under the foregoing standards that the scheme for imposing capital punishment under section 76–5–103.5(2)(b) of the Utah Code violates the Eighth Amendment to the United States Constitution because it is procedurally inadequate to prevent the arbitrary selection of candidates for imposition of the death penalty. *See* part III.A and B.1 below. However, a majority of the court has not joined in this conclusion. Nevertheless, a majority of the court concludes that section 76–5–103.5(2)(b) violates the Eighth Amendment in that the death penalty is per se a cruel and unusual punishment for the crime of aggravated assault by a prisoner under any circumstances. *See* part III.B.2 below.

*A. Section 76–5–103.5 Does Not Present a Procedurally Valid Sentencing Scheme*

After the United States Supreme Court's ruling in *Furman* that "the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner," *Godfrey,* 446 U.S. at 427, 100 S.Ct. at 1764 (summarizing plurality holding in *Furman*), the Georgia legislature revised its capital sentencing procedures. Many other states, including Utah, did the same. *Gregg,* 428 U.S. at 179–80 & n. 23, 96 S.Ct. at 2928 & n. 23 (citing, among others, Utah Code Ann. §§ 76–3–206, –3–207, and – 5–202 (Supp.1975)). The Court in *Gregg* upheld Georgia's revised sentencing scheme, finding that

> the concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sen-

tence and provided with standards to guide its use of the information.

*Gregg,* 428 U.S. at 195, 96 S.Ct. at 2935. The Court warned that these procedures were no guarantee of constitutionality, however, and insisted that "each distinct [sentencing] system must be examined on an individual basis." *Id.* Nevertheless, the Court held that the procedural requirements of *Furman* were satisfied by Georgia's statutory scheme, which (1) provided for separate sentencing procedures where evidence of aggravating and mitigating factors can be presented to the jury, (2) required that a jury find at least one statutory aggravating circumstance before imposing the death penalty, and (3) provided for automatic appeal to and review by the state supreme court as a "check against the random or arbitrary imposition of the death penalty." 428 U.S. at 206, 96 S.Ct. at 2940. *See generally id.* at 206–07, 96 S.Ct. at 2940–41.

Utah's capital sentencing scheme for criminal homicide contains all of these elements, and we have repeatedly found that it comports with the procedural requirements of *Furman. See, e.g., State v. Carter,* 888 P.2d 629, 657–58 (Utah 1995); *State v. Holland,* 777 P.2d 1019, 1024–25 (Utah 1989); *Pierre,* 572 P.2d at 1348. All capital offenses in Utah, including aggravated assault by a prisoner, are subject to sections 76–3–206 and –207 of the Utah Code. Section 76–3–206 provides for automatic review of death sentences by the state supreme court. Section 76–3–207 provides that sentencing proceedings are to be held separately from the guilt determination phase of a trial. During the guilt determination phase, a trier of fact determines whether a particular defendant has committed a capital felony and is eligible for the death penalty. Under section 76–3–206 of Utah's capital sentencing scheme, a sentencing jury or judge has discretion to impose the death penalty, life imprisonment, or life imprisonment without parole on a defendant who has been convicted of a capital felony in the guilt phase of a trial. Utah Code Ann. § 76–3–206(1). Section –207 directs the discretion of the sentencer by providing for the consideration of mitigating circumstances as set forth in that section and of aggravating circumstances as set forth in section 76–5–202.

To comply with *Furman,* the discretion of the fact finder in the guilt phase also "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg,* 428 U.S. at 189, 96 S.Ct. at 2932. Consistent with this requirement, "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty [of the same crime]." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). Moreover, this narrowing function must be accomplished "by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey,* 446 U.S. at 428, 100 S.Ct. at 1764 (citation omitted) (quoting *Gregg,* 428 U.S. at 198, 96 S.Ct. at 2936). We have held that with respect to capital homicide, Utah has complied with the narrowing requirement in the guilt determination phase "by requiring that a jury find at least one statutory aggravating circumstance beyond a reasonable doubt in the guilt phase of a first degree murder trial." *Andrews v. Shulsen,* 802 F.2d 1256, 1262 (10th Cir.1986) (citing *State v. Pierre,* 572 P.2d 1338, 1348 (Utah 1977)); *see also* Utah Code Ann. § 76–5–202 (setting forth aggravating circumstances under any one of which criminal homicide constitutes aggravated murder, a capital offense).

However, while the aggravating factors set forth in section 76–5–202 of the Utah Code may perhaps be used by a sentencing authority during the sentencing phase of any capital trial, *see* Utah Code Ann. § 76–3–207(3), their application during the guilt phase is limited to prosecutions for criminal homicide, where the defendant is accused of "knowingly caus[ing] the death of another." *See id.* § 76–5–202(1). These statutory factors do not by their plain language apply to aggravated assault by a prisoner under section 76–5–103.5. A fact finder is thus left with unchanneled discretion to convict a defendant prosecuted under section 76–5–103.5 of a cap-

ital felony, a first degree felony, or a second degree felony, unguided by any statutorily described aggravating factors. The risk that sentences imposed under this scheme will be arbitrary, capricious, irrational, freakish, or discriminatory is thus unchecked.

The State relies on the argument that the legislature can define an offense such that the constitutionally required narrowing function is performed by the definition itself. While this is true, *see Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994); *Lowenfield v. Phelps,* 484 U.S. 231, 246, 108 S.Ct. 546, 555, 98 L.Ed.2d 568 (1988), I am not persuaded that the statute at issue here meaningfully "narrow[s] the class of persons eligible for the death penalty." *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742. Section 76–5–103.5 reads:

(1) Any prisoner, not serving a sentence for a felony of the first degree, who commits aggravated assault is guilty of a felony of the second degree.

(2) Any prisoner serving a sentence for a felony of the first degree who commits aggravated assault is guilty of:

(a) a felony of the first degree if no serious bodily injury was caused; or

(b) a capital felony if serious bodily injury was intentionally caused.

Utah Code Ann. § 76–5–103.5 (1995). The statute thus contains two requirements as preconditions for death penalty eligibility: (1) The prisoner must be serving a sentence for a first degree felony, and (2) the prisoner must intentionally cause serious bodily injury. Neither of these conditions, however, satisfies the constitutional requirement of an aggravating factor so as to justify "the imposition of a more severe sentence on the defendant compared to others found guilty [of the same crime]." *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742.

As explained in the state constitutional analysis above, the first degree felony requirement does not restrict eligible defendants to those who have committed violent crimes. There are various other crimes in the Utah Code that are designated as first degree felonies but are not indicative of any predisposition or tendency toward violence that might justify a capital sentence. I

would therefore conclude that the first degree felony requirement of section 76–5–103.5 does not sufficiently narrow the class of death-eligible defendants and accordingly does not satisfy the constitutional requirements of an aggravating factor.

However, the State also argues that "the 'serious bodily injury' requirement sufficiently narrows the pool of death-eligible defendants under the statute" because it further serves to distinguish among the pool of all persons who commit aggravated assault while serving a sentence for a first degree felony. But the requirement of a "serious bodily injury intentionally caused" does not satisfy the *Zant* test any better than the first degree felony requirement. The statute for aggravated assault reads:

(1) A person commits aggravated assault if he commits assault as defined in Section 76–5–102 and he:

(a) intentionally causes serious bodily injury to another; or

(b) uses a dangerous weapon as defined in Section 76–1–601 or other means of force likely to produce death or serious bodily injury.

Utah Code Ann. § 76–5–103(1) (1995). Relying on the requirement that "serious bodily injury was intentionally caused" as an aggravating factor amounts to nothing more than prosecution under subsection (1)(a) rather than subsection (1)(b). Clearly this differentiation cannot properly be called an "aggravating" factor. Neither does it "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of [the same crime]" so as to satisfy the narrowing requirement of *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742.

Furthermore, in the past year the legislature has amended section 76–5–103 so that "[a] violation under Subsection (1)(a) is a second degree felony" and "[a] violation under Subsection (1)(b) is a third degree felony." Utah Code Ann. § 76–5–103 (Supp. 1996). Essentially, the statute now consists of two different crimes, with completely different elements and different punishments. The fact that subsections (1)(a) and (1)(b) are in the same "aggravated assault" section may be merely an accident of legislative organiza-

tion. But to claim that there is any meaningful narrowing within the statute on aggravated assault by a prisoner simply because it requires that the assault involve the intentional causing of serious bodily injury seeks for a distinction that does not exist.

In light of the foregoing, Justice Stewart and I would conclude that Utah's section 76–5–103.5(2)(b) permits fact finders to convict defendants of a capital felony without adequate procedural safeguards against arbitrary and discriminatory sentencing, and is therefore unconstitutional under the Eighth Amendment as it has been explicated by the Supreme Court in *Furman, Gregg,* and *Zant.*

### B. Capital Punishment Under Section 76–5–103.5(2)(b) Is Cruel and Unusual Per Se

Gardner and Simmons also argue that section 76–5–103.5 violates the Eighth Amendment in that the death penalty is per se a cruel and unusual punishment for the crime of aggravated assault by a prisoner. As mentioned above, the Supreme Court has established two standards against which a punishment may be measured to determine whether it is inherently cruel or unusual under the Eighth Amendment. The Court will first look to "the evolving standards of decency that mark the progress of a maturing society," as these standards are manifested in various "objective indicia that reflect the public attitude toward a given sanction." *Gregg,* 428 U.S. at 173, 96 S.Ct. at 2925. But the Court warned that these public perceptions are "not conclusive. A penalty must also accord with 'the dignity of man,' ... [which] means, at least, that the punishment not be 'excessive.'" *Id.* (quoting *Trop,* 356 U.S. at 100, 78 S.Ct. at 597). We conclude both (1) that the objective indicia of public attitude do not reflect anything like widespread acceptance of capital punishment for assault by a prisoner, and (2) that death is an excessive punishment for the crime of aggravated assault by a prisoner under any circumstances.

1. "Evolving standards of decency" weigh against the death penalty for aggravated assault by a prisoner.

In *Furman,* the petitioners had argued with some success that while the death penal-

ty was clearly accepted by the drafters of the Constitution and the Eighth Amendment, social "standards of decency had evolved to the point where capital punishment no longer could be tolerated." *See Gregg,* 428 U.S. at 179, 96 S.Ct. at 2928 (summarizing petitioners' argument in *Furman*). The Supreme Court in *Gregg* reexamined the "standards of decency" argument but found that "a large proportion of American society continues to regard [capital punishment] as an appropriate and necessary criminal sanction." *Id.* In reaching this conclusion, the Court looked to various "objective indicia that reflect the public attitude toward a given sanction." *Id.* at 173, 96 S.Ct. at 2925. The Court found:

> The most marked indication of society's endorsement of the death penalty for murder is the legislative response to Furman. The legislatures of at least 35 States have enacted new statutes that provide for the death penalty for at least some crimes that result in the death of another person.... [A]ll of the post Furman statutes make clear that capital punishment itself has not been rejected by the elected representatives of the people.

428 U.S. at 179–81, 96 S.Ct. at 2928–29.

Five years later in *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Supreme Court examined a Georgia statute providing the death penalty for rape of an adult woman. The Court again looked at legislative enactments from around the country as an indication of contemporary "standards of decency." *Id.* at 593, 97 S.Ct. at 2866. This time, however, the Court noted that "Georgia is the sole jurisdiction in the United States at the present time that authorizes a sentence of death when the rape victim is an adult woman...." *Id.* at 595–96, 97 S.Ct. at 2868. The Court concluded from these facts that societal indicia "weigh[ ] very heavily on the side of rejecting capital punishment as a suitable penalty for raping an adult woman." *Id.* at 596, 97 S.Ct. at 2868.

██ The State argues that unlike the Georgia statute at issue in *Coker,* section 76–

5–103.5(2)(b) of the Utah Code is not the only one of its kind in the nation. It points out that Montana has enacted a nearly identical provision. *See* Mont.Code Ann. § 46–18–220 (1995). That the legislatures of two of the fifty states have enacted such provisions does not persuade us that capital punishment for aggravated assault by a prisoner reflects the "evolving standards of decency" in the United States. Certainly the legislative judgment of two jurisdictions is more persuasive than that of only one, but in *Enmund v. Florida*, 458 U.S. 782, 792–93, 102 S.Ct. 3368, 3374, 73 L.Ed.2d 1140 (1982), the Supreme Court stated that its finding that "only a small minority of jurisdictions—*eight*—allow the death penalty to be imposed [for felony murder]" was a fact that "weighs on the side of rejecting capital punishment for the crime at issue." (Emphasis added.) Two are considerably fewer than eight. Justice Stewart and I would therefore conclude that the objective data do not support the conclusion that the Utah statute reflects contemporary standards of decency.

The *Coker* Court also considered the sentencing determinations of Georgia state juries in its assessment of contemporary standards of decency. 433 U.S. at 596–97, 97 S.Ct. at 2868–69. However, similar data are not available in the current case because, interestingly, since the enactment of section 76–5–103.5(2)(b) in 1974 no prosecutor has sought a capital conviction under that section until now. It is also noteworthy, in light of contemporary "standards of decency," that no defendant has been executed for a nonhomicide crime in the United States since 1975, and since 1977 no judge or jury in the United States has imposed the death penalty on a defendant in a nonhomicide case.[11]

2. Death is an excessive punishment for the crime of aggravated assault by a prisoner.

The Supreme Court in *Gregg* found that a penalty "must accord with 'the dignity of man,' ... [which] means, at least, that the punishment not be 'excessive.'" 428 U.S. at 173, 96 S.Ct. at 2925 (citation omitted). The Court then explained, "When a form of punishment in the abstract (in this case, whether capital punishment may ever be imposed as a sanction for murder) rather than in the particular (the propriety of death as a penalty to be applied to a specific defendant for a specific crime) is under consideration, the inquiry into 'excessiveness' has two aspects." *Id.* The Court identified them as "the unnecessary and wanton infliction of pain" and "punishment ... grossly out of proportion to the severity of the crime." *Id.* (citations omitted). The Court in *Coker* again summarized these aspects of excessiveness:

> [A] punishment is "excessive" and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground.

433 U.S. at 592, 97 S.Ct. at 2866. After examining section 76–5–103.5(2)(b), we find that it exacts a punishment that is excessive under both parts of the Supreme Court's test.

11. The Louisiana Supreme Court upheld the constitutionality of a statute permitting the imposition of the death penalty for the rape of a child under twelve years of age, *State v. Wilson*, 685 So.2d 1063 (La.1996), *cert. denied sub nom. Bethley v. Louisiana*, —— U.S. ——, 117 S.Ct. 2425, 138 L.Ed.2d 188 (1997), but there were no convictions and no sentences in the Louisiana case, which, like the instant case, involved only a pretrial facial challenge of the statute's constitutionality. *Wilson*, 685 So.2d at 1065, 1073. It remains true that no judge or jury has imposed the death penalty in a nonhomicide case in the United States since 1977.

Furthermore, it should be noted that while the United States Supreme Court denied the Louisiana defendant's petition for a writ of certiorari, three members of the Court chose to write specifically reiterating the "well settled" principle that their denial of certiorari "does not in any sense constitute a ruling on the merits of the case." *Bethley*, —— U.S. at ——, 117 S.Ct. at 2425. These Justices suggest that certiorari may have been denied only because the Louisiana decision does not represent a final judgment in the case, as in this instance "[p]etitioner has been neither convicted of nor sentenced for any crime." *Bethley*, —— U.S. at ——, 117 S.Ct. at 2426 (statement by Stevens, Ginsburg, and Breyer, JJ.).

The first part of the test is satisfied if the punishment serves the purposes of retribution or deterrence. *Gregg*, 428 U.S. at 183, 96 S.Ct. at 2929. Section 76–5–103.5(2)(b) serves neither purpose very well. In *Tison v. Arizona*, 481 U.S. 137, 149, 107 S.Ct. 1676, 1683, 95 L.Ed.2d 127 (1987), the Court stated that to serve retributive goals of justice properly, "a criminal sentence must be directly related to the personal culpability of the criminal offender." The State argues that this requirement is satisfied by section 76–5–103.5(2)(b)'s requirement of an intent to inflict serious bodily injury, which the State says provides "a direct relationship between the prisoner's personal culpability and the possible imposition of the death penalty." But the requirement that a punishment be "related to personal culpability" demands more than the bare existence of criminal intent. The theory of retributive justice is a theory of just deserts, and some notion that the punishment should fit the crime is inherent in that theory. This notion seems especially true when one considers that the retribution requirement is an articulation of *Gregg*'s prohibition against "the *unnecessary* and wanton infliction of pain," 428 U.S. at 173, 96 S.Ct. at 2925 (emphasis added), and *Coker*'s prohibition against the "*needless* imposition of pain and suffering." 433 U.S. at 592, 97 S.Ct. at 2866 (emphasis added). The statute's requirement of a finding of "intent to cause serious bodily injury" does indicate personal culpability, but it is not a level of culpability that is "directly related" to the punishment of death, as *Tison* requires. *See* 481 U.S. at 149, 107 S.Ct. at 1683. For example, the statute's elements would be met by someone deliberately and successfully punching a person in the nose with a view to breaking it. A broken arm, foot, or even finger would satisfy the statute's definition of serious bodily injury as "protracted loss or impairment of the function of any bodily member." *See* Utah Code Ann. § 76–1–601(10).

As for deterrence, the State offers two theories of the statute's potentially deterrent effects. First, the State points out that the section prohibits direct and intentional conduct. While it is true that a statute that has no element of intent is less likely to deter potential criminals than one that does, it does not follow that any statute which does contain such an element will necessarily "make a measurable contribution" to deterring the particular crime at issue. *Coker*, 433 U.S. at 592, 97 S.Ct. at 2866. While people generally assume that stiffer penalties have a greater deterrent effect, in fact one may argue that a disproportionately harsh punishment will undermine the goals of deterrence. Disproportionate penalties may make prosecutors and sentencers reluctant to seek or impose penalties they see as unjust. (As mentioned, the two prosecutions before the court now are the first in more than twenty years of this statute's existence.) And if unnecessarily harsh penalties are imposed, they may still undermine the State's effort to deter more serious crimes because criminals may recognize that once they have exposed themselves to a capital punishment, the State has no further power to punish them. For example, under Utah's scheme an eligible prisoner involved in an aggravated assault will have no reason to refrain from killing his victim because the penalty for murder is no harsher than that for aggravated assault.

Furthermore, even if we assume that excessively harsh penalties continue to have a deterrent effect, the proportionality analysis cannot be divorced from the goal of deterrence. As I have explained in the state constitutional analysis above, a statute that is justified purely by its deterrent effect may easily be so excessive as to constitute cruel and unusual punishment. *See Commonwealth v. Jackson*, 369 Mass. 904, 344 N.E.2d 166, 173–74 (1976); *People v. Broadie*, 37 N.Y.2d 100, 371 N.Y.S.2d 471, 478, 332 N.E.2d 338, 344 (1975).

The State also refers to the inherent violence of prison society and, citing the suggestion in *Gregg* that the death penalty may be the only adequate deterrent for "murder by a life prisoner," 428 U.S. at 186, 96 S.Ct. at 2931, argues that "any punishment other than death eligibility [may be] inadequate to deter future violence" by first degree felony prisoners convicted of aggravated assault. This suggests that while the death penalty may be disproportionately harsh for the crime of aggravated assault by a prisoner, it

is nevertheless justified as a necessary expedient in some cases. Two important differences distinguish this case from the hypothetical situation in *Gregg,* however: The Utah statute does not punish murder, and it is not limited to life prisoners. Section 76–5–103.5(2) applies to all first degree felons; obviously, not all first degree felons are life prisoners. Clearly less extreme measures could be taken to control inmates imprisoned for first degree felonies, including the postponement of parole dates, additional sentences, or even extended periods of solitary confinement.

Utah's section 76–5–103.5(2)(b) is not narrowly tailored to meet any of the "acceptable goals of punishment" set forth in *Coker* or suggested as justifications for the statute in the State's brief. If its purpose is to regulate prison society, as the State claims, why doesn't it apply to all prisoners? If its purpose is to control only violent offenders, why does it apply to *all* first degree felons (a group including persons involved in certain forgeries and credit card frauds)? If it is considered the only means of deterring certain prisoners who have nothing else to lose, why isn't it limited to those already serving life sentences?

██ Finally, a majority of this court concludes that the death penalty for aggravated assault by a prisoner is "excessive" in that it is "grossly out of proportion to the severity of the crime." *Coker,* 433 U.S. at 592, 97 S.Ct. at 2866. In *Coker,* the majority (actually a plurality plus Brennan and Marshall, who concurred in the judgment on the separate ground that the death penalty is per se unconstitutional) held that the death penalty was so grossly disproportionate a punishment for the crime of rape of an adult woman that it constituted cruel and unusual punishment per se. *Id.* The State attempts to distinguish this case by citing language from *Coker* in which the Supreme Court observed that "rape by definition does not include the death *or even the serious injury to another person.*" 433 U.S. at 598, 97 S.Ct. at 2869. However, an examination of the broader context of the Court's language in *Coker* does not give us any reason to believe that the result would have been different had the

Georgia statute also required a finding of serious bodily injury. The Court in *Coker* said:

> We do not discount the seriousness of rape as a crime. It is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim and for the latter's privilege of choosing those with whom intimate relationships are to be established. *Short of homicide, it is the "ultimate violation of self."* It is also a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. Rape is very often accompanied by physical injury to the female and can also inflict mental and psychological damage. Because it undermines the community's sense of security, there is public injury as well.
>
> . . . .
>
> This does not end the matter; for, under Georgia law, death may not be imposed for any capital offense, including rape, unless the jury or judge finds one of the statutory aggravating circumstances and then elects to impose that sentence. [The aggravating circumstances were (1) rape committed by a person previously convicted of a capital felony; (2) rape committed in course of commission of another crime; and (3) rape "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim."] Here the first two of these aggravating circumstances were alleged and found by the jury.
>
> Neither of these circumstances, nor both of them together, change[s] our conclusion that the death sentence imposed on Coker is a disproportionate punishment for rape. Coker had prior convictions for capital felonies—rape, murder, and kidnaping—but these prior convictions do not change the fact that the instant crime being punished *is a rape not involving the taking of a life.*

433 U.S. 584, 597–99, 97 S.Ct. at 2869 (emphasis added). Thus as the State notes, the Court in *Coker* did observe that "rape by definition does not include the death or even the serious bodily injury to another person."

Ultimately, however, the language referring to seriously bodily injury upon which the State relies was obviated by the Court's rejection of the totality of Georgia's sentencing scheme, which did include aggravated battery to the victim as one of the aggravating circumstances permitting the death penalty. *Id.* at 598–99, 97 S.Ct. at 2869–70.

The *Coker* holding leaves no room for the conclusion that any rape, even an "inhuman" one involving torture and aggravated battery but not resulting in death, would constitutionally sustain imposition of the death penalty. We may or may not think the Supreme Court reached the right result in so concluding, but we do not see the persuasiveness of an argument that any aggravated assault, no matter how vicious, could be legally more reprehensible than any rape, no matter how brutal. And under *Coker*, no rape, *"with or without aggravating circumstances,"* can constitutionally qualify for the death penalty when death has not resulted. *Id.* at 600, 97 S.Ct. at 2870.

We therefore hold that section 76–5–103.5(2)(b) violates the Eighth Amendment to the United States Constitution, and we reverse the district courts on that basis.

STEWART, Associate C.J., concurs in Justice DURHAM's opinion.

ZIMMERMAN, Chief Justice, concurring in part and concurring in the result:

I join only in the last two paragraphs of section III.B.2 of Justice Durham's opinion, discussing the United States Supreme Court case of *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality). I would strike the statute as violative of the United States Constitution. If, as the State argues, the United States Supreme Court has not adopted a per se rule precluding the death penalty in situations where no killing is involved, then I am content to have that Court tell us so in no uncertain terms. Until then, I must be guided by the results of the Supreme Court's cases, such as *Coker* and *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), and what few clear and consistent statements they contain. I read these cases as barring the death penalty in the cases before us. I decline to

divine some more subtle lesson from the entrails of those contorted death penalty opinions.

Having concluded that the statute is violative of the Eighth Amendment to the United States Constitution, I would not reach the Utah constitutional issues dealt with by Justice Durham so sweepingly and at such length. These issues were inadequately briefed before this court, as Justice Durham effectively concedes. *See State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988), *habeas granted sub nom. Lafferty v. Cook,* 949 F.2d 1546 (10th Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992).

RUSSON, Justice, dissenting:

I respectfully dissent. I believe that section 76–5–103.5(2)(b) of the Utah Code is constitutional on its face, and therefore, I would remand these cases for further proceedings.

## I. UNITED STATES CONSTITUTION

### A. *Procedural Safeguards*

It is important to note that in Utah, conviction of a capital crime does not automatically mean a sentence of death. Those convicted of capital crimes may also be sentenced to life imprisonment with or without the possibility of parole. *See* Utah Code Ann. § 76–3–207(4). Thus, conviction may assure a finding of one statutory aggravating circumstance but does not de facto mean the defendant will be sentenced to death. That is still left to the jury to decide under Utah's death penalty scheme, which has been explicitly held constitutional. *State v. Bishop,* 753 P.2d 439, 460 (Utah 1988); *State v. Brown,* 607 P.2d 261, 268–69 (Utah 1980); *State v. Pierre,* 572 P.2d 1338, 1345, 1348 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978).

Individuals charged under section 76–5–103.5(2)(b) of the Utah Code are entitled to the same procedural safeguards as are individuals charged with aggravated murder. For example, a unanimous jury must still find the accused guilty of the underlying crime beyond a reasonable doubt. Also, in a

separate hearing, the jury must unanimously determine the appropriate sentence. In that hearing, the jury's deliberations are guided by section 76-3-207 of the Utah Code, which directs the jury to consider aggravating and mitigating circumstances. Any sentence of death is automatically appealed to this court for review, and federal and state habeas corpus proceedings are available as avenues to review the sentence. Thus, discretion to impose the penalty of death under section 76-5-103.5(2)(b) is carefully circumscribed.

Justice Durham argues that the statute does not sufficiently narrow the class of persons eligible for the death penalty under the statute. She states that only two requirements must be met before the statute applies: "(1) The prisoner must be serving a sentence for a first degree felony, and (2) the prisoner must intentionally cause serious bodily injury." She then asserts that neither of these requirements is a sufficiently aggravating factor so as to justify "the imposition of a more severe sentence on the defendant compared to others found guilty [of the same crime]." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). However, Justice Durham fails to delineate and account for the most important aggravating factor built into the statute: The person charged *must be a prisoner.* This factor alone sets section 76-5-103.5(2)(b) apart from the various other statutes to which Justice Durham compares it. It serves as an aggravating factor because it narrows the class of eligible defendants to those who are currently being punished for other serious criminal activity. Thus, it is unhelpful to compare the penalty for "normal" aggravated assault with the penalty for aggravated assault by a prisoner resulting in intentionally caused serious bodily injury.

### B. Death Penalty and Nonhomicide Crimes

Justice Durham concludes that section 76-5-103.5(2)(b) is per se cruel and unusual because "objective indicia of public attitude do not reflect anything like widespread acceptance of capital punishment for assault by a prisoner, and ... death is an excessive punishment for the crime of aggravated assault by a prisoner under any circumstances." I do not share Justice Durham's view of federal death penalty jurisprudence.

First, Justice Durham fails to cite any specific data in support of her public acceptance argument. In any event, each state is entitled to address its own problems individually, and although different states may come up with different conclusions, both may be constitutional. If the basis for determining a statute's constitutionality was how many states had similar statutes, no state could ever enact a novel or distinctive law without being thwarted by a constitutional challenge. Furthermore, I am not sure the overall trend in societal attitudes is away from imposing the death penalty. The increasing number of prisoners on death row may reflect the opposite. In addition, Justice Durham's claims are not entirely correct. She claims that since 1977 no judge or jury has imposed the death penalty in a nonhomicide case. While this may be so, in *State v. Wilson,* 685 So.2d 1063 (La.1996), *cert. denied sub nom. Bethley v. Louisiana,* —— U.S. ——, 117 S.Ct. 2425, 138 L.Ed.2d 188 (1997), the Louisiana Supreme Court, in a consolidated case, upheld the constitutionality of Louisiana Revised Statute 14:42(c), permitting the imposition of the death penalty for the rape of a child under twelve years of age. Justice Durham's contention that there was no conviction or sentencing is irrelevant. The fact remains that the statute permitting the death penalty for a nonhomicide crime was upheld. Whether this is an aberration or evidence of a trend is unknown at this time. Nonetheless, the holding in that case stands.

Second, I am not ready to conclude that the statute makes no measurable contribution to the acceptable goals of punishment or, as discussed above, that it is grossly out of proportion to the underlying crime. Justice Durham, showing little faith in our justice system or juries, appeals to a slippery-slope argument in speculating that someone could be sentenced to death under section 76-5-103.5(2)(b) for breaking an arm, a foot, or even a finger. Yet, she ignores a truly plausible possibility: A prisoner serving a life sentence without possibility of parole might permanently cripple someone during an ag-

gravated assault and yet be subject to only nominal, if any, punishment.

Third, Justice Durham argues that "less extreme measures could be taken to control inmates[.]" However, nothing requires a state to impose the least strict penalty available. *See Gregg v. Georgia,* 428 U.S. 153, 175, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976) (plurality). Further, in the case of first degree felons who are serving life sentences without possibility of parole, it is hard to see what further measures could be taken that would be effective.

Finally, Justice Durham asks why, if its purpose is to regulate prison society, section 76–5–103.5(2)(b) does not apply to all prisoners? The answer is simple: Although subsection (2)(b) does not apply to all prisoners, subsection (1) does. Section 76–5–103.5 reaches all prisoners, while the *punishment* mandated by the section varies according to the category of the crime for which the prisoner is serving time. This is not so different from recidivist statutes[1] or the sentencing schemes in the United States Sentencing Guidelines and in Utah, which both look to criminal history in determining appropriate penalties.

Even if Justice Durham had correctly addressed and relied on the Utah Constitution in her opinion, her analysis thereunder is flawed. Justice Durham correctly characterizes this appeal as a facial challenge to the constitutionality of section 76–5–103.5(2)(b). However, her discussion of the statute is based not on a facial challenge, but rather on a proportionality analysis. It is unclear to me how we can validly discern an understanding of proportionality in the abstract. In these cases, discovery is incomplete and there have been no trials, no determinations of guilt or innocence, no judgments, and no sentences whatsoever. Yet with no facts, evidence, or sentences to guide her, Justice

Durham proceeds to discuss whether the hypothetical possibility of the death penalty is proportionate to defendants' alleged crimes about which we know nothing.

In her analysis, Justice Durham apparently misunderstands the distinctive standard that applies to a *facial* challenge to the constitutionality of a statute. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists under which the Act would be valid.*" *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (emphasis added); *see also Greenwood v. City of North Salt Lake,* 817 P.2d 816, 819 (Utah 1991) ("In challenging the ordinance on its face, plaintiffs must show that it is 'invalid *in toto*—and therefore incapable of any valid application.'" (quoting *Steffel v. Thompson,* 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974))). She claims that *Salerno* is a due process case and therefore distinguishable. However, *Salerno* is both a due process and an Eighth Amendment case. The no-set-of-circumstances standard applies in both instances. Instead of *Salerno,* Justice Durham claims that the correct standard for an Eighth Amendment facial challenge is merely a presumption of validity. However, the case she cites for the proposition, *Gregg v. Georgia,* is not a facial challenge to the statute. There the Court specifically stated that it is reviewing the statute "as it applied in this case." 428 U.S. 153, 162, 96 S.Ct. 2909, 2920, 49 L.Ed.2d 859 (1976). Therefore, the *Gregg* presumption-of-validity standard is inapplicable here. The standard set in *Salerno* is appropriate here.

Applying the *Salerno* standard, I am not prepared to say that section 76–3–103.5(2)(b) of the Utah Code can never be valid under

---

1. *See Rummel v. Estelle,* 445 U.S. 263, 276, 284–85, 100 S.Ct. 1133, 1140, 1144–45, 63 L.Ed.2d 382 (1980) (upholding constitutionality of mandatory life sentence under recidivist statute; "the interest of the [state] here is not simply that of making [the underlying offense criminal]; it is in addition the interest, expressed in all recidivist statutes, in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to

the norms of society.... [The primary goal of a recidivist statute] is to deter repeat offenders.... Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction.").

any set of facts. It may be that a prisoner who is already serving a life sentence for various violent crimes and who beats a prison guard so violently that the guard is left in a permanent vegetative state would be justified in receiving the death penalty. How can we possibly say that there can be no set of facts in these cases that would justify the death penalty when we have no set of facts to review? We should leave it to the jury, subject to the procedural guidance of sections 76–3–206 and –207 of the Utah Code, to decide whether defendants' crimes warrant the death penalty. If the jury should so decide, jurisdiction will again be conferred upon this court to review the decision. At such a time, a proportionality analysis would be more proper.

Justice Durham's proportionality analysis in the context of a facial challenge is very problematic. For example, Justice Durham is forced to make abstract determinations regarding which crimes are more heinous than others. While we agree that the death penalty is a disproportionate penalty for littering, would everyone agree that it is *always* disproportionate in a case where the victim did not die? Does it not depend on the factual circumstances of the crime? While life was apparently "not over" for the rape victim in *Coker v. Georgia*, 433 U.S. 584, 598, 97 S.Ct. 2861, 2869, 53 L.Ed.2d 982 (1977), are we sure that life is not over for a rape victim who has also been severely beaten and left in a permanent vegetative state? What about for a prison guard who has been severely beaten by an inmate and left in a permanent vegetative state? Obviously, these questions are difficult, if not impossible, to answer in the abstract. That is why we of necessity must review each circumstance on a case-by-case basis. Similarly, Justice Durham's attempt at analyzing society's "evolving standards," *see Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality), and what might "shock the conscience" of the average citizen is by necessity subjective. Attempting such an analysis divorced, as in this case, from any underlying facts is merely an academic exercise in hypotheticals and is improper in the context of a facial challenge.

Justice Durham also adopts the three "Lynch factors" for an "objective" test of proportionality. To briefly reiterate her position, we are first to look at " 'the nature of the offense and/or the offender with particular regard to the degree of danger both present to society' "; second, we are to " 'compare the challenged penalty with the punishments prescribed·in the same jurisdiction for different offenses which, by the same test, must be deemed more serious' "; and third, we are to "conduct 'a comparison of the challenged penalty with the punishments prescribed for the same offense in other jurisdictions[.]' " (Quoting *In re Lynch*, 105 Cal. Rptr. at 226, 227, 228, 503 P.2d at 930, 931, 932.) Again, I am not sure that these "objective" criteria apply in the context of a facial challenge to a criminal statute. In the context of a facial challenge, we know very little about the true nature of the offense, the personality of the offender, or the danger he or she may present to society. Similarly, an accurate description of a particular crime is practically impossible in the absence of factual information. Further, comparing the punishment and classification of aggravated assault by a prisoner with the punishment and classification of other crimes in Utah amounts to a reevaluation of our entire penal code and involves a weighing and reweighing of the severity of various crimes and the appropriate punishment for those crimes. This analysis is appropriate for the legislature, not for this court. Finally, while the law found in other states can provide us guidance, it is certainly not dispositive. The separate states have long been viewed as "independent laboratories," [2] and uniformity

---

2. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting) ("[It is] one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."); *Washington v. Glucksberg*, —— U.S. ——, ——, 117 S.Ct. 2302, 2303, —— L.Ed.2d —— (1997) (O'Connor, J., concurring) (assisted suicide); *United States v. Lopez*, 514 U.S. 549, 581, 115 S.Ct. 1624, 1641, 131 L.Ed.2d 626 (1995) (Kennedy, J., concurring) (possession of firearm in school zone); *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (O'Connor, J.,

has never been a requirement for constitutionality. *Compare Harris v. Alabama,* 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (upholding sentencing scheme where capital sentencing determination vested in trial judge who must "consider" advisory jury verdict) *with Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (upholding sentencing scheme where capital sentencing determination vested in trial judge who must give "great weight" to advisory jury verdict) *and* Utah Code Ann. § 76–3–207(4) (vesting capital sentencing determination in trier of fact; trial judge bound by jury determination).

Because only a portion of the federal constitutional analysis in section III.B.2 of Justice Durham's lead opinion has gained a majority, the balance of her opinion is dicta. Nonetheless, I will briefly respond to her state constitutional analysis.

## II.  UTAH STATE CONSTITUTION

Justice Durham claims that defendants "argued that the [death] penalty violates the cruel and unusual punishments clause and the unnecessary rigor clause of article I, section 9 of the Utah Constitution" in their motions below. However, these "arguments" are nowhere to be found. In Gardner's memorandum in support of defendant's motion to dismiss, Gardner merely alleges that the "imposition of the death penalty ... would be a violation [of] Article 1, Section 9 of the Utah Constitution." These mere assertions are not the equivalent of, and do not amount to, arguments. Nowhere does Gardner discuss the state constitution or tie any part of his Eighth Amendment argument, or any other argument, together with his assertions under the Utah Constitution. Furthermore, he offers no test for constitutional validity under the Utah Constitution and cites no case law in support of his challenge. After discussing the Eighth Amendment, Gardner summarily concludes, "Imposition of the death penalty ... can only be viewed as a violation ... of the Utah Constitution[.]"

These are the *only* mentions of the Utah State Constitution in Gardner's entire memorandum other than in its introduction. This hardly constitutes "argument" sufficient to allow us to adequately address the issue.

Similarly, Simmons failed to set forth any semblance of an argument under the Utah Constitution below. While Simmons did set forth a test for constitutionality, he failed to apply the test or analyze the issue at all. In conclusory terms, he states that article I, section 9 is broader than its Eighth Amendment counterpart and then concludes that the statute is therefore unconstitutional. Again, I fail to see how Justice Durham can unearth any "argument" presented to the trial court by either defendant that would aid us in analyzing the state constitutional issue.

Although both Gardner and Simmons did briefly raise the state constitutional issue on appeal, both defendants presented their oral arguments solely under the Eighth Amendment to the United States Constitution. During those arguments, no justice of this court asked either defendant to discuss the state constitutional challenge. Further, the article I, section 9 arguments in defendants' briefs center on the "unnecessary rigor" clause—an argument that Justice Durham dismisses without analysis—not on the "cruel and unusual punishment" clause.

In addition, both in the trial court and before this court, the State responded only to the federal constitutional challenge, relying on *State v. Lafferty,* 749 P.2d 1239 (Utah 1988), *cert. denied sub nom., Cook v. Lafferty,* 504 U.S. 911, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992), where we held that we will not reach state constitutional claims when a party relies on parallel federal constitutional provisions and relies only nominally on the state constitution. *Id.* at 1247 n. 5. This seems to be the very situation before the court now. However, Justice Durham summarily dismisses this argument in footnote 1 and instead states, "In light of the paucity of guidance offered by decisions of this court or

concurring) (withdrawal of life-sustaining treatment); *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 50, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16 (1973) (financing public education); *see also Spaziano v. Florida,* 468 U.S.

447, 464, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340 (1984) ("The Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws.").

the court of appeals on the meaning of article I, section 9 of the Utah Constitution, we regard defendants' efforts sufficient in this capital case to properly present the state constitutional question for our analysis." Thus, in order to address the state constitutional issue, Justice Durham creates out of thin air an exception supposedly giving us the power to address issues that are not properly before us under *Lafferty* simply because this court has not previously offered enough "guidance" on the issue. I cannot agree with an exception that seems to render *Lafferty* meaningless and allows us to address any issue that may strike our fancy.

## CONCLUSION

Section 76–5–103.5(2)(b) of the Utah Code has existed in Utah in one form or another for 98 years. It has been subject to review, revision, and recodification, the last time as recently as 1996. The fact that no prisoner has been sentenced to die pursuant to the statute does not therefore compel the conclusion that society has rejected it. On the contrary, perhaps the attempted application of the statute in the case before us is more reflective of current societal attitudes. It is precisely because it reflects such attitudes that we defer to the legislature in drafting our criminal laws.

Justice Durham poses numerous questions in relation to the statute. Many of these questions are valid in the abstract and important at the legislative policy-formulating level. None of these questions, however, lead to the conclusion that section 76–5–103.5(2)(c) is unconstitutional on its face. I would uphold the district court's ruling that the statute is constitutional on its face and remand for further proceedings.

HOWE, J., concurs in Justice RUSSON'S dissenting opinion.